UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM AYERS,<br>Plaintiff<br><br>V.<br><br>C.P. BOURG, INC.,<br>Defendant | CIVIL ACTION NO. 04-10137-FDS |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S [SECOND] MOTION TO AMEND COMPLAINT

Now comes the Defendant, C.P. Bourg Inc. ("C.P. Bourg"), in opposition to the Plaintiff's [Second] Motion to Amend Complaint. As grounds for its opposition, C.P. Bourg states that the Plaintiff's proposed amendment to include a count for breach of the implied covenant of good faith and fair dealing should be denied because the Plaintiff has admitted under oath facts sufficient to demonstrate that he had not earned the commission at issue in his proposed amendment. For this reason, as more fully set forth below, C.P. Bourg asks that this Court deny the Plaintiff's [Second] Motion to Amend.

## BACKGROUND FACTS

C.P. Bourg is a manufacturer and distributor of post-press binding and finishing equipment. C.P. Bourg's U.S. operations are based in New Bedford, Massachusetts. The company suffered a series of financial setbacks earlier in the decade, exacerbated by the September 11, 2001 tragedy. Over a period from January 2001 through November 2003, C.P. Bourg reduced its total employee headcount from ninety-five (95) employees to sixty-two (62)

employees through a series of restructurings, layoffs and non-replacement of vacated positions. The Plaintiff was laid off from his sales position on October 24, 2002.

Mr. Ayers filed a complaint for age discrimination with the Equal Employment Opportunity Commission on or about August 13, 2003. Mr. Ayers subsequently removed his suit to federal district court on January 16, 2004 alleging only age discrimination. On July 9, 2004, prior to any substantial discovery in this matter, the Plaintiff filed by assent his First Amended Complaint including allegations of violations of M.G.L. c. 149, §§148, 150 for alleged failure to pay commissions the Plaintiff claims were due for his involvement in sales efforts to a client called National Life of Vermont. C.P. Bourg has denied liability on both claims.

Mr. Ayers has acknowledged that he was subject to a written sales commission policy at the time of his termination. Deposition of William Ayers ("Ayers Depo") at 10-11 (excerpts attached here to as Exhibit A); C.P. Bourg, Inc. Sales Representative Commission Plan-Fiscal Year 2002-2003 attached hereto as Exhibit B. That policy states that C.P. Bourg will compensate sales representatives according to a certain commission scale "for each order submitted, accepted and delivered in their territory <u>during</u> employment with the Company." See Exhibit B (emphasis in original).

In August 2002, Mr. Ayers gave a quote to National Life of Vermont for a particular C.P. Bourg product. However, Mr. Ayers has admitted under oath that:

- He did not submit an order for the sale while he was employed (Ayers Depo at 21);
- The order was not accepted while he was employed (<u>Id.</u> at 22);
- The order was not delivered while he was employed (<u>Id.</u> at 23);

- The customer ordered a different product than the product quoted by Mr. Ayers (Id. at 19);

- The customer paid substantially more for the product purchased than the amount quoted by Mr. Ayers (Id. at 18); and

- Mr. Ayers is aware of no statements by company employees or documents that support his claim that he was terminated to avoid paying him commission on the National Life of Vermont sale (Id. at 37).

On January 7, 2003, the customer wrote to Mr. Ayers' successor thanking him for his assistance in obtaining the C.P. Bourg product. A copy of this memo is attached as Exhibit C. The customer notes that their "prior Bourg representative" (Mr. Ayers) failed to respond to several calls placed to him

The Plaintiff filed his [Second] Motion to Amend Complaint on May 19, 2005 seeking to add a count for alleged violation of the covenant of good faith and fair dealing.

## ARGUMENT

Despite liberal policies favoring amendment of complaints, an amendment should be denied if it is futile. Hatch v. Dept. for Children, 274 F.3d 12, 19 (1st Cir. 2001); Correa-Martinez v. Arrillaga Baker, 903 F.2d 49, 59 (1st Cir. 1990). The measure of "futile" varies upon the posture of the case. As paper discovery has been completed and depositions of all principal actors have been taken, the Plaintiff's claim is futile as it has no support in the record and, is directly contradicted by the Plaintiff's own admissions.

Massachusetts case law prohibits employers from terminating employees for the purpose of denying the employee amounts earned by him. Fortune v. Nat'l Cash Register Co., 373 Mass. 96 (1977). In Fortune, the plaintiff was a sales representative for a large cash register chain

working under a written contract that was terminable at-will, without cause, by written notice. Id. at 97. Mr. Fortune arranged a $5,000,000 sale with one of NCR's largest clients. Id. at 98-99. After paying Fortune only a portion of his commission, NCR transferred and then fired Fortune before he would become eligible for the remainder of his commission. Id. at 99-100.

The Court equated Fortune's termination with a situation "[w]here the principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale . . ." Id. at 104-105, citing Restatement (Second) of Agency §454 and Comment a. The Supreme Judicial Court held that Fortune's express contract with NCR contained "an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of the contract." Id. at 101. Finding ample evidence of "overreaching" by NCR, the Supreme Judicial Court held that the question of whether NCR "was motivated by a desire to pay Fortune as little of the bonus credit as it could" was properly submitted to a jury under a breach of implied covenant theory. Id. at 105. Subsequent cases have modified the Fortune doctrine to make it clear that a plaintiff is entitled to seek recovery only for "identifiable, reasonably anticipated future compensation; based upon his past services . . ." Gram v. Liberty Mutual Ins. Co., 384 Mass 659, 66 (1981); See also McCone v. New England Tel. & Tel. Co., 393 Mass. 231, 233-34 (1984).

Here, Mr. Ayers has no basis for recovery. Unlike Mr. Fortune, did not complete his sale, submit an order, have that order accepted or have any product delivered to the client. As such, no compensation became due to Mr. Ayers prior to his termination. The actual sale that occurred after his termination was for a different product model at a different (and higher) price so there is no reasonably calculable anticipated compensation at issue. Finally, the customer's

correspondence makes it clear that the sale that was ultimately closed was not due to Mr. Ayers' efforts but rather occurred despite his failure to respond to calls from the customer.

As such, the Plaintiff's [Second] Motion to Amend is futile and the Defendant asks that this court deny the motion.

Respectfully submitted,
C.P. BOURG, INC.

By its attorneys,

_____
Richard C. Van Nostrand, Esq.
BBO #507900
Michael D. Badger, Esq.
BBO #633915
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:   (508) 791-8502

Dated: June 2, 2005

### CERTIFICATE OF SERVICE

I, Michael D. Badger, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Suzanne Garrow, Esq., Heisler, Feldman & McCormick, P.C., 1145 Main Street, Suite 508, Springfield, MA  01103.

_____
Michael D. Badger, Esq.

Dated: June 2, 2005

# C.P. BOURG, INC.
## SALES REPRESENTATIVE COMMISSION PLAN – FISCAL YEAR 2002-03

1. **OVERVIEW**: Bourg's policy is to compensate all sales representatives for each order submitted, accepted & delivered in their territory <u>during</u> employment with the Company.

2. **QUOTA**: Each sales rep is assigned an equipment sales quota of $50,000 Gross Margin (as defined in Article 3) for F/Y/E March 31, 2003. This quota is shall be based exclusively on Xerox Reseller product sales (i.e. BDF-K, HCS-X).

3. **COMMISSIONABLE BASE**: A commission will be paid on the "Gross Profit" of the equipment sold. "Gross Profit" for digital products shall be assigned a Twenty Percent Gross Margin per system less any miscellaneous costs associated with the sale, if any. Freight will be the actual charge for shipment and installation charges will be deducted from the sale based on established installation fee schedules unless waived by Bourg management.

4. **COMMISSION RATE**: Listed below is the commission rate to be applied to the Gross Profit of sales accepted and delivered by Bourg. Commissions shall be paid in the month following receipt of FULL payment from the customers. Commissions paid for returned sales shall be setoff against all future earnings.

    | Gross Profit | Commission |
    |---|---|
    | $1-$50,000 | 20% |
    | $50,001-$100,000 | 35% |
    | $100,000+ | 45% |

5. **TRADE-IN EQUIPMENT**: If a trade-in allowance is granted and equipment obtained from a purchaser, the right to sell such trade-in equipment shall be exclusive to the selling Bourg sales representative for a period of thirty (30) days from invoice date. Thereafter, any Bourg sales representative may sell the trade-in equipment which will have a "zero" book value associated with it.

6. **SALES DOCUMENTATION**: C.P. Bourg, Inc. reserves the right to withhold any commission check until such time that all required branch documentation is submitted by the sales representative to the appropriate managing personnel.

7. **TERRITORY**: Your assigned territory until otherwise notified shall be New Jersey to Maine, including New York City and excluding New York State west and north of Albany.

This plan becomes effective April 1, 2002. BOURG MANAGEMENT RESERVES THE RIGHT TO ALTER, MODIFY OR AMEND ANY OR ALL PORTIONS OF THE PLAN UPON PRIOR WRITTEN NOTICE.

Received By: *[signature]* Buddy Ayers
Date: 4/1/02

**EXHIBIT A**

**EXHIBIT 2**
Ayers
DATE: 4/7/05
SUSAN E. LEPORE

```
                                          Volume I
                                          Pages:   1-260
                                          Exhibits: 1-27

           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


WILLIAM AYERS,

                  Plaintiff

        vs.                          C.A. No. 04-10137-FDS

C.P. BOURG, INC.,

                  Defendant

              *   *   *   *   *   *   *   *


     DEPOSITION of WILLIAM AYERS called as a
witness by the Defendant, pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Susan E. Lepore,
Registered Professional Reporter and Notary
Public within and for the Commonwealth of
Massachusetts, held at the law offices of
Mirick, O'Connell, DeMallie & Lougee, LLP,
100 Front Street, Worcester, Massachusetts,
on Thursday, April 7, 2004, commencing at
10:10 a.m.



              ************************************

                FLYNN REPORTING ASSOCIATES
                Professional Court Reporters

                    One Exchange Place
              Worcester, Massachusetts  01608
              (508)755-1303  *  (617)536-2727
                 TOLL FREE: (888)244-8858
                    Fax (508)752-4611

              ************************************
```

EXHIBIT B

```
 1        Q.    Did you give a quote to National Life
 2   of Vermont for the system they ultimately
 3   purchased?
 4        A.    Yes.
 5        Q.    Who took over on the National Life
 6   account after you left C.P. Bourg?
 7        A.    I have no idea.
 8        Q.    Do you have any idea what work was
 9   done with the National Life account after your
10   termination?
11        A.    No, I don't.
12              MR. BADGER:  Would you mark this as
13   the first exhibit, please?
14              (Ayers Exhibit Number 1 was
15               marked for Identification.)
16        Q.    At the time of your termination, Mr.
17   Ayers, what was your position with C.P. Bourg,
18   Incorporated?
19        A.    Digital account specialist.
20        Q.    I'm showing you what's been marked as
21   Exhibit 1 in your deposition.  Could you
22   identify that document for the record, please?
23              (Witness perusing Exhibit 1.)
24        A.    It's the Sales Representative
```

```
 1   Commission Plan, Fiscal Year 2002 to '03.
 2       Q.    Is that your signature that appears
 3   on the bottom?
 4       A.    Yes, it is.
 5       Q.    What is the date that appears on the
 6   bottom?
 7       A.    6/5/02.
 8       Q.    Is that date in your handwriting?
 9       A.    Yes.
10       Q.    Mr. Ayers, is this the commission
11   plan that applied to you at the time of your --
12   at and immediately prior to the time of your
13   termination?
14       A.    Yes.
15       Q.    When did you first receive this
16   commission plan?
17       A.    6/5/02.
18       Q.    And had you negotiated the terms of
19   this commission plan in any way?
20       A.    Nope.
21             MR. BADGER:  Would you mark this as
22   the next exhibit for me, please?
23             (Ayers Exhibit Number 2 was
24              marked for Identification.)
```

1    Life?
2        A.    It says Bob Kelsey.
3        Q.    And can you tell the date of the
4    quotation?
5        A.    10/31, 2002.
6        Q.    This quotation includes a quotation
7    for the 16-pocket Modulen; is that correct?
8        A.    Yes.
9        Q.    And that's different from the quote
10   that appears in Exhibit 3?
11       A.    Yes.
12       Q.    And the quote appears to be for
13   approximately $15,000 more than the quote you
14   made in August 2002; is that right?
15       A.    Yes.
16       Q.    And this quote specifically includes
17   a one-year warranty on parts and labor; is that
18   correct?  And by "this quote," I mean Exhibit 4.
19       A.    Yes.
20       Q.    Did your quote, in August of 2002,
21   include a warranty on parts and labor?
22       A.    Yes.
23       Q.    Is it listed on the quotation?
24       A.    No.

1  Q. What was the warranty practice of C.P. Bourg?

3  A. One year defective parts and labor.

4  Q. Regardless of whether it was listed on a quotation or not?

6  A. Yes.

7  Q. Coincidentally, we just have the front face of these quotations. Is there any language that would appear on the back of the quotation form you use?

11 A. No.

12 Q. To your knowledge, did National Life of Vermont buy a 14-pocket Module 5 Series Collator?

15 A. No.

16 Q. Do you know what they actually purchased?

18 A. A 16 pocket.

19 Q. And do you know when they purchased it?

21 A. I'm assuming 10/31, 2002.

22 Q. What's that --

23 MS. GARROW: He's not asking you to guess.

1    Q.    What's that assumption based on?
2    A.    The signed quotation.
3    Q.    Can you tell whose signature that is
4    that appears on the -- under the "Quotation
5    Accepted" line?
6    A.    No.
7    Q.    Are you familiar with Ed Lamorey's
8    signature?
9    A.    No.
10         MR. BADGER:  Would you mark this as
11   the next exhibit, please?
12         (Ayers Exhibit Number 5 was
13         marked for Identification.)
14   Q.    I'm showing you what's been marked as
15   Exhibit 5, Mr. Ayers.  Have you seen this
16   document before today?
17         (Witness perusing Exhibit 5.)
18   A.    No.
19   Q.    Can you tell me what this document
20   is?
21   A.    It's a Show Special Sales Agreement.
22   Q.    Between C.P. Bourg and National Life
23   Insurance?
24   A.    Yes.

```
 1        Q.    For the Modulen product?
 2        A.    Yes.
 3        Q.    And is its date the same as the
 4   quotation that's listed as Exhibit 4?
 5              (Witness perusing Exhibits.)
 6        A.    Yes.
 7        Q.    Did you obtain this sales agreement
 8   from National Life of Vermont, Mr. Ayers?
 9        A.    No.
10        Q.    Do you know who did?
11        A.    No.
12        Q.    Can you tell by reviewing the
13   document who did?
14              MS. GARROW:  I object.  But you can
15   go ahead, if you can tell.
16        A.    Well, it's signed Robert Kelsey.  I
17   have no knowledge whether he did or not.
18        Q.    Was Mr. Kelsey an employee of
19   National -- excuse me, of C.P. Bourg?
20        A.    Yes.
21        Q.    What's your understanding of what Mr.
22   Kelsey's position was at the time of your
23   termination?
24        A.    Sales rep.
```

```
 1        Q.    What does it mean to have a sale
 2   accepted by C.P. Bourg?
 3              MS. GARROW:  Objection.  Go ahead,
 4   you can answer.
 5        A.    When it's paid for.
 6        Q.    And what does it mean to have a sale
 7   delivered?
 8              MS. GARROW:  Objection as to form.
 9        Q.    Or, an order delivered, excuse me.
10              MS. GARROW:  Objection.  You can
11   answer.
12        A.    I'm sorry, repeat the question?
13        Q.    What does it mean to have an order
14   delivered?
15              MS. GARROW:  Objection, you can
16   answer.
17        A.    When it's delivered to their dock.
18        Q.    That's the physical delivery of the
19   product?
20        A.    Yes.
21        Q.    Does that include installation of the
22   product?
23              MS. GARROW:  Objection, you can
24   answer.
```

1    Q.    Let me rephrase the question, Mr.
2    Ayers.  Does the term delivered, as it's used in
3    your sales commission plan, include installation
4    of the product at the customer's location?
5         MS. GARROW:  Objection as to form.
6    You can answer.
7    A.    I'm not sure.
8    Q.    Did you have any involvement with the
9    delivery of the 16-pocket Modulen product and
10   the other equipment described here to National
11   Life Insurance?
12   A.    No.
13   Q.    Who's John Dahlstrom, sir?
14   A.    He's the New Bedford branch service
15   manager.
16        MR. BADGER:  Would you mark this as
17   the next exhibit, please?
18        (Ayers Exhibit Number 6 was
19        marked for Identification.)
20   Q.    Mr. Ayers, how did you learn a sale
21   had been concluded to National Life?
22   A.    I don't remember.
23   Q.    I'm going to show you what's been
24   marked as Exhibit 6, sir.  Have you seen that

| | | |
|---|---|---|
| 1 | A. | Could be 30 days to one year. |
| 2 | Q. | Do you recall C.P. Bourg terminated you in order to avoid paying you commissions on any other account that you may have had outstanding quotes on? |
| 6 | A. | No. |
| 7 | Q. | Do you have any -- strike that. |
| 8 | | Are you aware of any statements by any C.P. Bourg employee that would support your claim that the reason they terminated you was to avoid paying you the National Life account commission? |
| 13 | A. | No. |
| 14 | Q. | Have you seen any documents from any C.P. Bourg employee that supports your claim that the reason they terminated you was to avoid paying you the National Life commission? |
| 18 | A. | No. |
| 19 | Q. | You say, on page two of Exhibit 8, that the selling price for the product is $170,675; is that correct? |
| 22 | | (Witness perusing Exhibit 8.) |
| 23 | A. | Yes. |
| 24 | Q. | That's not the actual selling price |

January 7, 2003

To: Bob Kelsey
    New England Sale Manager
    C. P. Bourg
    50 Samuel Blvd.
    New Bedford, Ma. 02745

From: Ed Lamorey
    V. P. Services & Support
    National Life Ins. Co.
    1 National Life Drive
    Montpelier, Vt. 05676

Bob,

   I want to " Thank You !" for all of your assistance /help that you provided us in the recent acquisition of a Bourg "Modulen" collator.

   I had placed several calls to our prior Bourg representative and received absolutely no response or help in our search for a replacement to our problematic tower collator that we had at the time.

   You responded very expeditiously and your thoroughness and attention to detail ( and John Dahlstrom 's as well), made a huge difference in our ability to actually do the physical acquisition and installation of a very superior collator to the one we had. Also, and probably more importantly, this collator better fits our Print Shop finishing needs that our customers require of us.

   Again, I can definitely say that we greatly appreciate the total package that was presented and delivered to NLIC by Bourg, courtesy of John and yourself.

EXHIBIT C

EXHIBIT 6
Ayers
DATE: 4/7/05
SUSAN E. LEPORE